Good morning, your honors. May it please the court. I'm here representing, I work for the city of Little Rock, representing officers Bryant and officers Oldham. In the case below, the court dismissed the city, the chief of police, and dismissed officers Bryant and Oldham in their official capacities. And as the opinion states, they relied on the Shackleton decision in holding that the officers had violated a clearly established right by using non-lethal force on Ms. Rudley to effect the arrest. It is our position that the court misapplied the Shackleton decision in this case because the facts are not similar to the facts before the court today. They're not similar in these respects. In Shackleton, an officer driving by a bar saw what he thought was a fight or an encounter outside a bar between a gentleman and the bartender. He turned around, the officer did, went back to the scene. The event had already de-escalated. The bartender had gone inside the bar and the man remained, and then the officer began questioning him. This was a small town and the officer knew the person. Well, let's get to the facts in this case. Yes, sir. We've read Shackleton probably 10 times each. Thank you, your honor. The facts in this case were this. About a week before the arrest in this case, Ms. Rudley's son had been involved in a fight at school. In that fight, he had broken his collarbone. He had been expelled from school as a result of that fight. This meeting was, that led to this. Do we know what the son did that caused the principal to think that there was a scuffle? In other words, did he use, how much of this broken clavicle had he already used at the time he was cuffed? Well, there was a fight about a week before. I don't know. I know he, we're talking about the morning of the event. The morning of the event. The whole theory against Officer Oldham is that he cuffed the man knowing that he was told he had a broken clavicle. My question is, how much did he use his arms vigorously or violently that morning? Well, I don't think the record... He had prompted the principal of the school to call for security help. That is correct, your honor. Do we know what he did? What we know is that the mother, according to what the principal told the police officer, officer Bryant, was that she threw a book at the principal. And it was a violent altercation. We don't know that the son did anything. There is nothing to indicate whether or not the son engaged in any violent activity while in the principal's office. He threw a book at the car. Did he do anything other than threaten? He did. He threatened. He also approached, moved toward the officer. And the officer then moved back behind the car. The main reason is that he threatened the officer at the car, that the officer reacted. There's nothing inconsistent with recovering from a broken clavicle in the son's actions that the officers knew about. Not that the officers knew about. So we're talking, in Oldham I assume, was he told how recently it was? That's where the facts, the court below misconstrued the facts from the affidavits that were submitted. There was another school official by the name of Jerry Moore who helped Officer Bryant escort the mother and the son out to the car. In the video, which the court states, and this is key to the court's, district court's opinion. The district court says that Oldham was warned of the broken collarbone. The court assumes that he was warned because he assumed that that was the officer that came into the video late in the altercation. The tasing had already occurred. Oldham came on after the fact. Jerry Moore was the one that was trying to, and he wasn't a police officer, he didn't have a gun or anything, but he worked for the school. He helped Officer Bryant escort the mother and the son out to the car. He was the one that was involved in the altercation. Now, Oldham comes up after the fact, according to his affidavit that's in the appendix, and he then handcuffs the son at that point. The court below misconstrued the facts in the affidavits below. So we have qualified immunity denied for a routine cuffing. That's exactly right. It's de minimis. Yeah, that's troubling. Yes, that's exactly right. There is no clearly established law where a person, in this case the son, was being arrested, and there's no dispute of facts in the record. It's admitted that the mother ran and inserted herself between the son and the officer. She says that she fell into him, slipped. He says that she pushed him, but there's no dispute. There was contact between the mother and the officer as he was going to arrest the son for his terroristic theft that he made to the officer. So in this case, there is no clearly established law. Shackleton does not apply in this case. Shackleton, the officer, knew that the guy could not move his arm. He knew what kind of condition he had. He was well aware of the person he was arresting, yet he forced the man's arm behind his back anyway. It's not analogous to the Brown case where Judge Wollman wrote the lead opinion in 2009. In that particular case, Ms. Brown, she was not the person that was stopped. Her husband was driving the car. She was just a passenger in the car. As the opinion says, it's disputed, the warning. Now we're talking about the mother, right? Yes. This is not the son's issue. No, it's not. It's only important that the son observed the action in his affidavit. He says he saw the officer reaching for his gun. What does the mother say? She says there was no warning before the action was taken. From the video, we can see from the video that she is the aggressor. She turns to him and she says, Did he feel physically threatened, I wonder? Well, yes, sir. From his perspective, this is what he perceived. One, he was told that they were violent or that the mother was violent inside the principal's office by throwing the book. He knew that the son had been involved in a fight at the school only a week or so beforehand. So he was escorting the two of them to the car to get her ID, and this other person, Mr. Moore, was with him. But unlike, for example, in the Brown case, Judge Wallman, if you recall, there were four or five officers outside the car by Ms. Brown, and all she did was call 911. And they tased her because she would not hang up the phone. These facts are nowhere near the facts that we had before the court in Shackleton or Brown. Why did Bryant say he tased her? He felt that she was, and he charged her with interfering with governmental operations. He was trying to perfect the arrest. He perceived the threat from her. She got between him and the son. She says she fell into him. He says she started hitting him. There's no dispute the mother made contact with the officer, but when he was trying to affect the arrest on the son, he perceived that as a threat. He was trying to control the scene. The scene, as again, the district court says after watching the video, that the scene was chaotic and combative. Chaotic and combative. That's what the district court said in the opinion. The scene was chaotic and combative. This is a split-second decision that the officer has to make. This is not an obvious case, as Judge Loken, you pointed out, in the Brossard v. Janko decision. And also Kinsella says it has to be an obvious case, one that's beyond debate. This is not beyond debate. Clearly, this right or constitutional question is not beyond debate. When does the officer say you're under – he told her she was under arrest? He told her – Before or after the tasing? He told her that she was – I know from the video, he told her that she was under – the officer says he told her she was under arrest when she inserted herself between him and the son. Before the tasing? Before the tasing. And what does she say about that question? She says that he – according to her, she says that he tased her without any provocation at all. That he just tased her. And he tased her three times. But the video shows that there's no threat. Did the bumping happen right when she put herself between the officer and her son? That's correct. Okay, so there wasn't like she got in between and then bumped him. Well, it was – I'm not sure that – I don't want to misstate. My recollection is that the bumping happened when she inserted herself between the son and the officer. Somehow the officer went around the back of the car toward the son, and somehow she got between – and she somehow got between the officer and the son, and that's when the bumping occurred. That's very different, though, than taking an additional action to try to bump the officer. That would be more aggressive than bumping them when you're interjecting yourself, I think. Unlike, for example, the case of – I believe it was Johnson v. Carroll where the aunt was protecting her nephew. In that case, she bear-hugged the nephew and took him to the ground in a totally – what the court referred to as a protective maneuver. That's not what we have here. This is not a protective maneuver. She is trying to prevent the officer from effectuating the arrest of her son after the son makes terroristic threats to the officer. What did the officer – what did Officer Bryant know about what happened in the principal's office? The brief isn't – the briefs are not very specific about it, and I'd like to know exactly if the officer said – if he was deposed or whatever. I'd like to know exactly what he said about that. According to the officer's affidavit – well, according to the principal's affidavit, when he called security and Officer Bryant came up, Officer Bryant knew at that time that he was calling security because, as the principal said, she threw a book at him. He knew she threw a book. That was his perspective. His perspective or – Was it the principal's or Bryant's? No, no. That was the principal had told Officer Bryant. And Bryant testified that he had been told by the principal that she threw a book. I'll leave that to the affidavit. I don't want to misstate that. Because that's very relevant as well to Officer Bryant. If he knows that she already took aggressive action against the principal, that would be very relevant to how he viewed her out on the parking lot. Well, he knew that security was called for a reason. And he knew that there was an altercation in the principal's office. He responded to the call. Right. Unlike Oldham just then came later. Oldham just came up later. Bryant is posted at the high school because he's what they call a security resource officer. He's actually there to protect the teachers and the students. That's what Bryant does. But he works for the city of Little Rock as a law enforcement officer. To what extent should we at all take into consideration our viewing of the video? She doesn't appear to me like being a member of the World Women's Federation of Wrestlers or anything like that. Well – Was she somewhat petite, put it that way, compared to the officer physically? Well, let's see. Well, I guess the video says what it says. Yeah. And it shows, Judge Wallman, I think the video shows and the district court acknowledges that she says to the officer Bryant that, Wait a minute, MF-er. And then he says, Stop, you're under arrest. And then she turns toward him. And then that's when he tases her again. Or tases her the first time. And then this piece of paper is she wanted to show the officer something about her son's medical condition? Well, that's the facts that the judge assumed to be. Maybe it has nothing to do with the case. Well, according to the district judge, that was the reasoning for him holding Odom liable, even though Odom came up after the fact. The judge is saying during this chaotic and combative scene that she's running with paper in her hand toward Odom saying he's got a broken collarbone. You know, I'm out of time. I'm not sure if I've used all of my time, but I would like the opportunity to do this brief rebuttal. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the court. My name is Kara Boyd Connors. I am counsel for the appellees here, Deidre Rutley and the minor, M.D. The district court got it right here. It's very clear that there are facts in dispute, material facts in dispute. And if you draw inferences. The court's established analysis was consistent with Casella. It couldn't have been more cryptic or less particular. Well, what do we do about that? Well, what do we. That's the issue we primarily have jurisdiction over. Absolutely. I think the issue in regards with Casella here is, I mean, that's distinguishable in the fact that. Don't worry about the facts. I'm talking about the analysis of the clearly established issue. The district court took a quote from one case. Yes, Your Honor. And said repeated tasing is a clearly established violation for which you don't get qualified immunity. That's simply wrong. Right. And I think what the court was saying, it was, if you look, if you analyze it under the reasonableness, the reasonableness of the officer, whether there was a need for that force. And so tasing someone three times under these facts are unreasonable. Well, that depends, though. I mean, I get back to this. I want to know exactly what the officer was told by the principal. Because if she threw a book at the principal and was aggressive towards the principal and then interjected herself between her son and the officer, I'm not so sure that the tasing was unreasonable, much less violated a clearly established right. And I understand, Your Honor, but in these facts, it's not entirely clear what the officers knew upon contact with the subjects. The city has alleged that they were advised of a fight. Wait, I want to know what the facts actually say. What do we know from the officer or from the principal as to what the officer was told? Do we know it? It seems to me that I'm getting a lot of cryptic answers, and that to me is an important fact. Right. And that's why these are facts in dispute that a trier of fact needs to decide. So tell me what the dispute is. The dispute is that whether the officers were aware of the injuries of the minor at the time of effectuating the arrest. I'm not interested in that. I'm talking about what the principal told the officer. Based on the information that was provided in the appendix from the defiance, the Officer Odom and Officer Bryant, they were advised because there was a disorder, a disruption in the office, and then they needed to be escorted out. So according to you. I thought it's been stated that the principal's affidavit stated that the principal told Bryant the mother threw a book at him. Is that in the affidavit? And if so, is there objectively reasonable evidence refuting that? In their affidavits, yes, Your Honor, there is mention by the defiance, Odom and Bryant, that the principal advised them that Ms. Brutley, the mother, had thrown a book and needed to be escorted off the premises. That's correct. What evidence is there refuting that? Ms. Brutley's account. She denies that. She denies throwing the book? She denies throwing the book, yes, Your Honor. What evidence contradicts that the principal, in fact, told the officers she threw a book? There is none. Okay. There is none. That's your problem with qualified immunity. And I don't think the district court even touched that. Well, I think because that doesn't go. Once they had walked from the school, the classroom, or the office of the principal to the vehicle, and at that time she had been asked for her ID. She was looking for her ID. The officer was demanding that she show her ID, and then this is when the altercation occurs. But here's the problem. Let's just change the facts ever so slightly. Let's suppose, and I know these aren't these facts, she punches the principal in the face. The principal then tells the officer, she just punched me in the face. He takes her out. She then interjects herself between her son and the officer, makes contact. Again, we don't know how that happened. It could have been completely incidental. That completely changes the complexion of what the officer views, doesn't it? Absolutely. And I think that those are not the facts here, Your Honor. And respectfully, whether the officers perceive that as violent is the question. Throwing a book, it's not very clear of how she threw the book. Did she throw it at his head? Did she toss it on the table? Those are facts that we, the trier of fact, has to determine here. Did Officer Bryant testify that he thought he might have seen a book in her hand? No, that is not in the record. She had a piece of paper in her hand? She had papers in her hand regarding her son's injuries. And that's what she was there to talk about. But the book throwing was before the car. Well before the car. That's what provides the backdrop for whether the officer was objectively reasonable to perceive Mom as a threat when he jumps in the middle and makes contact. She had already, according to the principle, threatened the principal. So she was in a course of continuing threatening conduct, if you will. Well, I think that's a fact in dispute, Your Honor. And that might go to Ms. Rutley, but does that go to Mr. Minor here? There was no allegations prior to the encounter where he tased his mother or was about to tase his mother that he became violent. I think he became violent when he saw the officer engage his mother. He didn't tase the son. Well, the son was arrested at that point and slammed to the ground. That's not the issue. Wait a minute. I thought the issue was the cuffing. The cuffing from his re-injuring his collarbone. What's the slam? Mom went to the ground. Right, and son did go to the ground. To help her up. Well, I think the facts are that the video will show that he was on the ground at some point and his collarbone was re-injured during the cuffing. Is he on the ground after the cuffing or before? After the cuffing. Okay, so that has nothing to do with the tasing. Well, no. Those are two separate incidents, Your Honor. There's the cuffing and then there's the tasing where mom is tased three times. All right, stay with the cuffing. What's your best denial of qualified immunity cuffing case? There aren't very many. There aren't very many, Your Honor. I mean, I think the facts are that they were aware of his injury, just like the court cited in Skelton that the officers were. Only Moore was aware. Oldham wasn't there yet. Well, Oldham arrived later, and I believe if he's attesting that he knew that the son was involved in a fight, then why are they being selective about what they knew about? They knew about the injury, the fight, but they didn't know about his injuries. And so I would submit that they were all aware that he had a preexisting condition. Was Oldham deposed? He gave an affidavit, Your Honor. Okay. Yes. There were no depositions. No depositions, Your Honor. But to get to the points here, there- People, professional athletes recover rather quickly from broken clavicles. Well, he was still- I'm not saying that your client is of that fitness. Well, I mean- But it's not obvious that a broken clavicle two weeks earlier would, A, prevent someone from being a threat, and B, require a different cuffing procedure. Well, I think the question here is whether at the time of the incident were they aware of his conditions. I mean, if he- Well, but why does that matter? Because that goes to the reasonableness of the use of force here, Your Honor. But the use of force was to cuff him. Well- This was not an unusual- They brought his hands behind his back to cuff him, right? Correct. That's standard, I think, standard procedure. Right. I haven't been a policeman, but I've seen a lot of cases. Well, and it's undisputed, too, that wasn't he struggling as well at that point? I think he had- The video comes on as Ms. Rutley is on the ground, and he is assisting his mother up, and then that is when Ms. Rutley is tased. There was not any time in between her being lifted up from the ground and her son assisting her that she has been tased. There's no pause. There's no stop. There's no warning prior to the tasing of Ms. Rutley. No, I'm talking about the cuffing, that he had been struggling before he got cuffed. Isn't that right? Am I wrong about that? Well, I think on the video it is chaotic. It appears that when Ms. Rutley is tased, he then goes to the other officer, and that is when there's the struggle between the two of them, and it's not quite clear whether he's resisting or if he's upset about his mom. His affidavit indicates he ran to the other officer to get assistance for his mother. I'm just trying to figure out, to be honest with you, and I'll ask the question directly. If he's struggling or interfering or whatever, then even if they knew about his injury, getting back to Judge Loken's question, if they cuffed him, that was a way to subdue him and make sure he stopped either threatening the officer, struggling with them, interceding in the situation, whatever the case may be. What's your response to that? Well, I think that he believes that he was wrongfully arrested. I think Ms. Rutley was found not guilty of these allegations, and I believe that these officers were overzealous in their arrest of these subjects. But this isn't an arrest appeal, is it? We're just talking about the excess force claim, or am I missing something? Well, Your Honor asked what would be my response to why wouldn't that arrest be proper. And their position is that the arrest— Not the arrest be proper, the cuffing. The cuffing be proper is that they were unlawfully arrested. But was that the claim? No, the claim is that it was excessive. Excessive force. Correct, yes. Which is irrespective of whether the arrest was valid. You're right, Your Honor, and I think that there's genuine issues of material fact in here. This is an interlocutory appeal on a summary judgment where these are all based on material issues of fact. I believe respectfully that the court lacks jurisdiction to even address these issues here of qualified immunity because they're all based on questions of fact. It is disputed whether Ms. Rutley was warned prior to the tasing. It is disputed whether Mr. Minor was being violent at the time. I want to ask you about your jurisdiction argument. What if we say, yeah, there's disputed issues, but none of them are material? Wouldn't we have the jurisdiction to say that? And therefore, because they're not material, we're going to reverse the district court's decision because on this record, the officers were entitled to qualified immunity. Well, I think these are all material disputed facts because, I mean, as the district court cited, I mean, an unarmed misdemeanorant is not entitled to that amount of force. I mean, I think it's very clear. You dropped the not resisting element of that equation. Well, I don't think Ms. Rutley was resisting. I think that at the time— That's the question. That's why whether he was told she'd thrown a book at the principal is relevant. Did he reasonably perceive her as someone who not only was resisting or interfering with son's arrest, but potentially one who was resisting by force? Right, and I don't think that she was, and that's a question that's in dispute. I think these are all questions for the trier of fact to decide whether she was resisting, whether her son was violent, whether the threat was real, whether they posed any threat. They were all unarmed. Prior to that, there had been no allegations that they had a weapon. I think you're arguing against qualified immunity, and that's a respectable opinion, but it's not a position, but it's not asserted law. Okay. Well, I just think that— This mother presented any real physical danger to any of the officers. Absolutely. However inelegant her language, use of language was, and however angry she might have been, she shouldn't have done what she did, but there was no danger that she would have injured either of them physically? No. She was not armed. These were officers. The video shows that she was just protecting her son with who had an injury. She was attempting to prevent him from being re-injured here. And these are all, as again, all facts in dispute for the trier of fact to decide. They were not advised that they were under arrest prior to the use of force. The force then says, oh, you have to submit based on the facts. And then she was tased multiple times. I thought the facts were, at least as opposing counsel's briefing, that Bryant told the son he was under arrest, and that's when the mother jumped between them. I think that at that point he was going towards him to arrest him at that point. Prior to that, nobody knew they were under arrest. That's when the force was used when she attempted to go towards him and advise him of his injuries. That's when the force began. And it was not prior to that. And am I right that the mother was on the ground from the first tasing, or was she taken? Her position is she was pushed to the ground by the officer. And the son was lifting her up. That's when the video starts. That was the first tasing. The tasing was after she was being lifted up from the ground. That was the first one. I thought that was the second one. No, that was the first tase. She had been pushed to the ground. The video was on for the first tasing? Yes. Yes, it starts at the time of the tasing. And I believe that's all I have here. And that's a body cam. The video was a body cam? Yes.  Thank you, Your Honors. Thank you, Counselor. I'm going to waive my rebuttal. I'll give you a minute for rebuttal. I was going to waive that unless you have questions, Your Honor. Pardon? I was going to waive the rebuttal. Very good. Very good. Thank you. Very good. You can always do that. Because the case has been thoroughly briefed and argued, and the argument's been helpful, and we'll take it under advisement. Thank you, Your Honor.